UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


SMITH WHOLESALE COMPANY, )
 INC., <u>et al.</u> )
 )
v. ) NO. 2:03-CV-221
 )
PHILIP MORRIS USA INC. )


# M E M O R A N D U M   O P I N I O N

This Robinson-Patman Act/Sherman Act complaint is before the

Court to consider the Motion for Summary Judgment filed by the defendant, Philip

Morris USA Inc.("PM"), on the basis that the defendant's discounts are function-

ally available to all distributors and because the defendant's market share

incentive program is lawful under the Sherman Act. [Doc. 176].

On June 11, 2003, sixteen plaintiffs filed suit against PM alleging that

PM's Wholesale Leaders ("WL")  program, a market share based discount program,

constituted illegal price discrimination and an attempt to monopolize under federal

antitrust laws. 15 U.S.C. § 1 *et seq*.  On July 14, 2003,  the State of Mississippi filed

an Intervenor's Complaint after obtaining leave of this Court.   Seventeen new

plaintiffs were added in an  amended complaint filed with this Court on November

14, 2003.

On August 6, 2003, this Court granted a preliminary injunction which enjoined PM from providing lower price discounts and /or rebates to the plaintiffs than are provided to the plaintiffs' competitors as proposed in the new 2003 WL. PM appealed this Court's order granting the preliminary injunction to the Court of Appeals for the Sixth Circuit and a Stay of the Preliminary Injunction was granted on September 18, 2003. PM's appeal of this injunction was argued and is currently pending before the Sixth Circuit.[1] Discovery is now closed. PM has filed its motion for summary judgment on all of the plaintiffs' claims and the claims of the State of Mississippi. After careful consideration of the record as a whole, this Court makes the following findings of fact and conclusions of law. For the purpose of deciding this motion for summary judgment, the Court will adopt the facts as submitted by the plaintiffs.

---

[1] Given this Court's conclusion that PM's WL program violates neither the Robinson-Patman Act nor the Sherman Act, the preliminary injunction was improvidently granted.

# FACTUAL BACKGROUND SUBMITTED BY THE PLAINTIFF

## A.    Cigarette Industry

The U.S. cigarette industry is highly concentrated  and oligopolistic. Philip Morris is the unchallenged market leader with 56% of sales by dollar volume and the two largest manufacturers, PM and R.J. Reynolds (RJR),  now control more than 80% of the market.  Like most oligopolies,  the cigarette industry exhibits little price competition and shows lock-step pricing among manufacturers of premium cigarettes.  Producers of low price 4th tier cigarettes have entered the market since the Master Settlement Agreement of 1998 and their entry has cap-tured less than 15% of the market but  has not caused a decrease in premium cigarette prices.

## B.    Plaintiffs'  Business

Plaintiffs sell tobacco and other products at wholesale to grocery and convenience stores and other retail outlets in various states.  Tobacco products constitute 50% or more of their sales and most plaintiffs have purchased directly from PM for more than 50 years.  As full service wholesalers, plaintiffs supply their retailer customers with products they request, including all major manufactur-ers' cigarettes as well as 4th tier and other non-PM cigarettes.  The retailers base their purchases on customer demand which is influenced by advertising, product

promotions and retail store programs, all controlled by the manufacturer.

C.      **PM's Wholesale Leaders Programs – 1999 To Present**

From 1999 through 2nd Quarter 2003, PM's Wholesale Leaders ("WL") program gave a 2.75% gross discount on PM products to direct distributors.  It also paid back-end money (i.e., quarterly rebates) conditioned on the wholesaler's achieving market share-based sales quotas of PM brands.  Thus, a distributor's sales of PM brands compared with non-PM brands determined its rebate, and the best back-end monies were paid for achieving PM share percentages which could go as high as 58.9%.   In other words, PM's WL program rewards distributors based on their sales of PM cigarettes as a percentage of their total cigarette sales.

Effective 3rd Quarter 2003, PM unilaterally revised its wholesale pricing structure by establishing a three-level pricing system, ranging from Level 1 (the least favored) to Level 3 (the most favored),  that based both price discounts and back-end monies on a market share comparison.  A share-based component also remains part of WL 2004.  WL's per carton  price differences between the worst and best price from 2nd Quarter 1999 to present were as follows:

| Effective Date | Maximum Price Difference |
|---|---|
| 2nd Quarter 1999 – 2nd Quarter 2000 | $ 0.23 |
| 3rd Quarter 2000 – 1st Quarter 2002 | $ 0.30 |
| 2nd Quarter 2002 – 2nd Quarter 2003 | $ 0.32 |
| 3rd Quarter 2003 | $ 0.81 |
| 4th Quarter 2003 | $ 0.55 (post injunction) |
| 1st Quarter 2004 – present | $ 0.24 |

PM's highest share (Level 3) quotas and its most favored prices have never been achieved by the plaintiffs.

## ROBINSON PATMAN/ACT CONCLUSIONS OF LAW

Plaintiffs' price discrimination claim is brought under Section 2(a) of the Robinson-Patman Act, 15 *U.S.C.* § 13(a).  To establish a *prima facie* case under Section 2(a),  plaintiffs must prove that:  (1)  PM's cigarette sales to plaintiffs and their competitors are "in interstate commerce";  (2)  the sales involve PM cigarettes of "like grade and quality";  (3)  the sales discriminate in prices[2] among these competing distributors; and (4)  the discrimination substantially lessens competition and causes antitrust injury to plaintiffs. *Schwartz v. Sun Co., Inc.*, 276 F. 3d 900, 903-904 (6th Cir.2002).  Plaintiffs seek damages for claimed loss of profit, customers, sales, goodwill and business value that resulted from PM's

---

[2]  Simply put, this means a difference in price.

allegedly discriminatory pricing. Plaintiffs further seek permanent injunctive relief against this alleged discrimination. The State of Mississippi is seeking injunctive relief on behalf of its consumers, wholesalers, and manufacturers and to prevent alleged injury to the economy of the state.

PM contends that summary judgment on plaintiffs' Robinson-Patman Act claims is appropriate in this case because PM's discounts are functionally available to the plaintiffs. If the best prices are "available equally and functionally to all customers", then no price discrimination has occurred. *Federal Trade Commission v. Morton Salt Co.*, 334 U.S. 37, 68 S. Ct. 822, 92 L. Ed. 1196 (1948); *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F. 2d 1319 (6th Cir. 1983). The plaintiffs contend that summary judgment is inappropriate in this case because issues of material fact remain in regard to whether or not the defendant's discounts are functionally available for several reasons:

1.     PM's data demonstrate that its best price is not available to all or most distributors,

2.     PM's best price is unattainable because distributors do not control consumer demand,

3.     Plaintiffs do everything asked of them to sell PM products,

4.     PM's share quotas are inherently unachievable, and

6

5. Plaintiffs must sell 4th tier and other competitor cigarettes to retain their business.

Plaintiffs appear to concede that PM's discounts are theoretically available to them but argue that the "choices" they must make to take advantage of PM's best prices "could potentially destroy their businesses". They argue that Section 2(a) does not require them "to change their business structure, reconfigure their customer base, or adopt an expensive and risky business plan in an effort" to achieve the best prices.[3]

The use of the functional availability theory to demonstrate the lack of an essential element of the plaintiffs' case, i.e. price discrimination, is technically not an affirmative defense, but the negation of an element of the plaintiff's case. See *Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, n. 17 (5th Cir.1998). If an essential element of the plaintiff's case is negated, summary judgment is appropriate.

The theory of "functional availability" is explained by the Sixth Circuit in *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1326 (6th Cir. 1983):

---

[3] The Court notes that such is the essence of a competitive economic system. Businesses that wish to succeed and gain market advantage over their competitors must make such choices everyday. Some flourish, some fail, but such is the nature of competition.

The practice of conditioning price concessions and allowances upon the customer's purchase of a specific quantity of goods will not give rise to a Robinson-Patman violation if the concessions are available equally and functionally to all customers. See *Federal Trade Comm. v. Morton Salt Co.*, 334 U.S. 37, 42, 68 S.Ct. 822, 826, 92 L.Ed. 1196 (1948); *Shreve Equipment, Inc. v. Clay Equipment Corp.*, 650 F.2d 101, 105 (6th Cir.), cert. denied, 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981); *Mowrey v. Standard Oil Company of Ohio*, 463 F.Supp. 762, 775-76 n. 17 (N.D.Ohio 1976), aff'd without opinion, 590 F.2d 335 (6th Cir.1978). See generally 16C Von Kalinowski, BUSINESS ORGANIZATIONS § 27.04 (1982). Further, a claim of price discrimination will not lie if the buyer failed to take advantage of a price concession which was realistically and functionally available. See *Shreve Equipment, Inc.*, supra, 650 F.2d at 105. The legislative history reveals that the aim of the Act is to prevent a large buyer from gaining discriminatory preferences over the small buyer solely because of the large buyer's greater purchasing power. See *Federal Trade Comm. v. Henry Broch & Co.*, 363 U.S. 166, 168-69, 80 S.Ct. 1158, 1160-61, 4 L.Ed.2d 1124 (1960); *Morton Salt Co.*, supra, 334 U.S. at 43, 68 S.Ct. at 826.

In *Bouldis*, the district court found that Suzuki's various promotional concessions and allowances were practically and realistically available to Bold-Morr, Inc., a former Suzuki motorcycle dealership whose officers and sole stockholders were Pete Bouldis and Norman Morris. In addition, the testimony of Bouldis revealed that he had cash flow and inventory problems at times which prevented him from participating in the promotional sales. Therefore, the Sixth Circuit found that,

8

by his own admission, there was no causal link between Suzuki's practices and Bouldis' alleged injuries but rather his inability to participate was attributable to his own business problems. The Sixth Circuit concluded that conditioning price concessions and allowances on the purchase of a specific quantity of goods is allowed if concessions were made available equally and functionally to all customers. *Id.*

Several other circuits have addressed the "availability" theory as well. In *Edward J. Sweeney & Sons Co. v. Texaco, Inc.*, 637 F.2d 105 (3d Cir. 1980), the Third Circuit found that customer pickup allowances from the seller's uniform zone delivered pricing system based upon the distance from the seller's delivery point was nondiscriminatory because it was available to all customers using a nondiscriminatory formula, even though different customers paid different prices. The Fifth Circuit found, in *Metro Ford Truck Sales*, 145 F.3d at 326, that price discrimination did not exist, and that no violation of the Robinson-Patman Act occurred, because Metro was treated the same as all other Ford dealers with respect to the CPA program for the same customer and products of like grade and quality. In *Comcoa, Inc. v. NEC Tels., Inc.*, 931 F.2d 655 (10th Cir. 1991), the Tenth Circuit found that there could be no recovery if the challenged discount was functionally available to the plaintiff and the program was evenly administered.

To the extent that there is an "availability" defense, it will fail if the lower price is not "practically" available to all competing customers. Discounts must be available not only in theory but in fact to be practically available. See *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1025- 26 (2d Cir. 1976). ("equal opportunity" is required; "even when a seller has a dual pricing system, if the lower price is available to all purchasers, not only in theory but in fact, there is no violation of § 2(a)")

Discounts that have been held to not be functionally available because they were discounts in theory but not in fact are:

1.      Quantity discounts. See *FTC v. Morton Salt Co.*, 334  U. S. 37 (1948) (holding that quantity discounts are not functionally available to many small buyers);

2.      When the purchaser was not told  about the discount.   See *Caribe BMW, Inc.v. Bayerische Motoren Werke*, 19 F.3d  745 (1st Cir. 1994) (favorable prices not practically available if the buyer was not told that it would receive the same prices as customers purchasing from different facility of supplier should buyer agree to purchase from that facility); and

3.      When the purchaser was not permitted to participate in the program. See *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499

(11th Cir. 1989) (recognizing the validity of the availability defense, but finding it inapplicable because the plaintiff was not given the opportunity to buy the lower-priced item).

None of these examples apply to the plaintiffs' situation because this case does not involve a quantity discount, the plaintiffs' were told about the discount, and the plaintiffs were permitted to participate in the program. The Court FINDS that PM's discount is available to all customers using a nondiscriminatory formula, even though different customers may pay different prices, and that there is no evidence that the program was not evenly administered. Therefore, the Court FINDS that PM's discount was functionally available to the plaintiffs in both theory and in fact. That plaintiffs may be faced with difficult business choices, and even that some may go out of business, makes little difference and does not create a genuine issue of material fact in this case. The antitrust laws were never intended to protect individual competitors. *See Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F. 3d 768, 769 (6th Cir. 2002), *cert. denied*, 537 U.S. 1148 (2003). Each of the individual plaintiffs may choose to make these difficult decisions or to do nothing at all; nevertheless, the choice is theirs. PM does not dictate the choices these wholesalers make.

The plaintiffs cite *Caribe,* 19 F.3d at 752, for the proposition that "plaintiff need not give up the advantages of its importer's contract in order to obtain the most favorable price." However, *Caribe* really states:

> The emphasized language says that Caribe did not know that its competitors were receiving favored treatment. And, we do not see how ordinarily one could say that a seller has made favored treatment "available" to a disfavored customer if the disfavored customer does not know about the favored treatment. See, e.g., *Alterman Foods, Inc. v. F.T.C.*, 497 F.2d 993, 1001 (5th Cir.1974); *Mueller Co. v. F.T.C.*, 323 F.2d 44, 46-47 (7th Cir.1963), cert. denied, 377 U.S. 923, 84 S.Ct. 1219, 12 L.Ed.2d 215 (1964); *Century Hardware Corp. v. Acme United Corp.*, 467 F.Supp. 350, 355-56 (E.D.Wis.1979).

> <u>Caribe also argues that the favored treatment, as a practical matter, was not "available" because BMW AG insisted that it give up various advantages of its importer's contract in order to obtain it. We cannot tell from the complaint, however, just what those advantages were and how they related to the practical "availability" of the favorable treatment given other retailers.</u> Thus, we cannot say, at this time, whether or not Caribe will be able to prove that the favorable price and terms, as a practical matter, were not available. At this stage, however, Caribe has sufficiently alleged that they were not.

> Our conclusion is that Caribe's complaint states a valid Robinson-Patman Act claim, in respect to price discrimination under Robinson-Patman Act § 2(a), and for similar reasons, under the Robinson-Patman Act sections that deal with payments for services, furnishing services, and brokerage payments. 15 U.S.C. § 13(b), (d)-(e). Although Caribe's pleadings regarding these other Robin-

12

> son-Patman Act sections are rather sparse, they are suffi-
> cient to give BMW AG and BMW NA notice of the
> substance of Caribe's complaint.  (emphasis added)

*Id.* at 752.   Therefore, *Caribe* does not hold what the plaintiffs assert but merely addresses the sufficiency of the complaint.

The plaintiffs also cite *National Dairy Products Corp. v. F.T.C.*, 395 F.2d 517, 523 (7th Cir. 1968) for the proposition that " 'the Robinson-Patman Act does not force [plaintiffs] to sacrifice their independence' in order to receive the highest discounts."   *National Dairy* was a proceeding on a petition of a dairy product distributor to set aside an order and decision of the Federal Trade Commission. The Seventh Circuit held that where a dairy product distributor operated in 35 states and it was typical to have volume discount schedules in effect at various operations, the order of the Federal Trade Commission requiring it to cease from unlawful price practices was not an abuse of discretion in view of the showing that the practices had occurred in widespread areas over a long period of time.  The Seventh Circuit concluded:

> We also cannot accept National's argument that the
> disfavored independents should have joined voluntary or
> cooperative groups and thus obtained higher discounts.
> The Robinson-Patman Act does not force them to sacri-
> fice their independence. One of the reasons for its enact-
> ment was to protect the independents from the chains and
> other large buying groups. *Federal Trade Commission v.*

> *Anheuser-Busch, Inc.*, 363 U.S. 536, 543-544, 80 S.Ct.
> 1267, 4 L.Ed.2d 1385; Rowe, Price Discrimination Under
> the Robinson-Patman Act (1962), pp. 11-23.

*Id.* at 523.

The Court FINDS that *National Dairy* is not on point with this case because that case involved volume discounts and there has been no suggestion or requirement by PM that these plaintiffs join voluntary or cooperative groups and sacrifice their independence.

In addition, the plaintiffs cite *Calumet Breweries, Inc. v. G. Heileman Brewing Co., Inc.*, 951 F.Supp. 749 (N.D.Ind. 1994), in which a beer wholesaler brought an action challenging the legality of a brewer's quantity discount program. The Court in *Calumet* stated:

> Moreover, the evidence tends to discount Heileman's contention that it would be a reasonable business decision for Calumet, because of its physical storage capacities and economic resources, to purchase enough beer to obtain the maximum discount. Heileman argues that Calumet does not do so because it has decided to maximize sales of competing brands, such as Anheuser-Busch, rather than aggressively promoting sales of Heileman products. According to Heileman, Calumet should compete with Central by structuring its purchases: obtaining the maximum discount by buying more than a month's supply of beer, warehousing it, and then selling from inventory in the following month(s). Nothing in the Robinson-Patman Act or the cases interpreting it suggests that Calumet's decision to emphasize

14

> other brands and remain a (relatively) small seller of
> Heileman products ipso facto means Heileman may
> charge Calumet a higher price:
>
> The legislative history of the Robinson-Patman Act
> makes it abundantly clear that Congress considered it to
> be an evil that a large buyer could secure a competitive
> advantage over a small buyer solely because of the large
> buyer's quantity purchasing ability. The Robin-
> son-Patman Act was passed to deprive a large buyer of
> such advantages except to the extent that a lower price
> could be justified by reason of a seller's diminished costs
> due to quantity manufacture, delivery or sale, or by rea-
> son of a seller's good faith effort to meet a competitor's
> equally low price. *Morton Salt*, 334 U.S. at 43, 68 S.Ct.
> at 826. (emphasis added)

*Id.* at 755.

*Calumet* is also not on point with this case because this case does not involve

volume discounts which permit a large buyer to secure a competitive advantage

over a small buyer because of the large buyer's quantity purchasing ability.


Therefore, the cases cited by the plaintiffs stand for the proposition that the

plaintiffs do not have to alter their independent <u>purchasing</u> status to receive the

discount. Not one of the cases cited by the plaintiffs addresses plaintiffs' <u>selling</u>

status nor supports plaintiffs' assertion that Section 2(a)does not require plaintiffs

to change their business structure, reconfigure their customer base, or undertake an

expensive and risky business plan.

15

Although the plaintiffs contend that PM's discounts are not functionally available to them because of the demands of their customers, applicable case law does not support the plaintiffs' conclusion that the demands of a purchaser's customer can render a discount functionally unavailable. Courts have refused to find discrimination when the buyer's inability to take advantage of the best discount was within the control of the buyer, such as poor credit, management choices, decisions not to hold inventory, or particular marketing strategies. See *Bouldis*, 711 F.2d at 1327; *Shreve*, 650 F.2d at 105; *Edward J. Sweeney*, 637 F.2d at 121; *Chapman v. Rudd Paint & Varnish Co.*, 409 F.2d 635, 643 (9th Cir. 1969).

The Court FINDS that the undisputed fact that an outside influence, not in the control of PM, i.e. plaintiffs' customer demands, frustrated their performance does not render the discounts under PM's WL program functionally unavailable. Therefore, because PM's discount is functionally available under the undisputed facts of this case, the defendant has demonstrated the lack of an essential element of the plaintiffs' case, i.e. price discrimination, and PM is entitled to summary judgment on plaintiffs' Robinson-Patman Act claims.

In this case, the Court also FINDS that there is no causal link between PM's practices and the plaintiffs' alleged injuries. Plaintiffs contend that they did not make a voluntary choice to emphasize fourth-tier or other non-PM

brand over PM's products, but that they have simply responded to the demands of their customers. Therefore, by their own admission, the plaintiffs' inability to participate in WL is attributable to an outside influence over which PM had no control. In effect, the plaintiffs seek to reap the rewards of the WL without furthering the purpose of that program, i.e., increasing the demand for PM products.

The Court FINDS that, because the plaintiffs did not take advantage of a lower price or discount which was functionally available on an equal basis, no price discrimination has occurred. In the alternative, the Court FINDS that any alleged discrimination was not the proximate cause of the plaintiffs' complained of injuries.

## SHERMAN ACT/CONCLUSIONS OF LAW

In addition to their claims under the Robinson-Patman Act, plaintiffs also allege that PM has engaged in an actionable attempt to monopolize in violation of the Sherman Act. A claim for attempted monopolization under § 2 of the Sherman Act, 15 *U.S.C.* § 2, requires: (1) a specific intent to monopolize; (2) anti-competitive conduct; and (3) a dangerous probability of success. *Tarrant Service Agency, Inc. v. American Standard, Inc.*, 12 F. 3d 609 (6th Cir. 1993)

17

Because plaintiffs cannot show genuine issues of material fact as to these three necessary elements, summary judgment will also be granted to defendant on plaintiffs' Sherman Act claim.

## DANGEROUS PROBABILITY OF SUCCESS

### *Market Power*

The United States Supreme Court has held that market power is a necessary element for showing a dangerous probability of achieving monopoly power in an attempt to monopolize case. *Spectrum Sports v. McQuillan*, 506 U.S. 447, 457, 113 S. Ct. 884, 891 (1993). In determining whether there is a dangerous probability of monopolization, courts have considered the relevant market and the defendant's ability to lessen or to destroy competition in that market. *Id.*

An attempt to monopolize claim requires "proof of market power", *Id.* at 457, and market power is "the power to control prices or exclude competition." *United States v. Grinnell Corp.*, 384 U. S. 563, 571 (quoting *United States v. E. I. du Pont De Nemours & Co.*, 351 U. S. 377, 391 (1956)) An analysis of market power requires that the court focus on the ability of a single seller to unilaterally raise prices and restrict output. *Spectrum Sports at* 457; *Virgin Atlantic Airways, LTD. v. British Airways*, 257 F. 3d 256 (2nd Cir. 2001); *Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F. 3d 1421 (9th Cir. 1995)

18

Plaintiffs assert that PM's "high market share is strong evidence of monopoly power" and argue that PM's dollar share of the cigarette market (56%) makes it the dominant company in the United States cigarette industry. This alone, according to plaintiffs, is sufficient to defeat summary judgment. PM's market share based on units sold has been calculated by plaintiffs at 49.6%.

Plaintiffs' position, however, has been expressly rejected by the Sixth Circuit Court of Appeals. Market share, standing alone, is insufficient to establish market power as a matter of law and is only the starting point for determining whether monopoly power exists. "[T]he inference of monopoly power does not automatically follow from the possession of a commanding market share." *American Counsel of Certified Podiatric Physicians and Surgeons v. American Board of Podiatric Surgery, Inc.*, 185 F. 3d 606, 623 (6th Cir. 1999) (quoting *Byers v. Bluff City News Co.,* 609 F. 2d 843, 850-851 (6th Cir. 1979)). *See also Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F. 2d 818 (6th Cir. 1982) PM's market share, standing alone, is therefore insufficient to establish market power as a matter of law.

Plaintiffs also suggest that PM's market share "likely understates its market power" since PM and RJR have a combined market share of about 83% and have very similar "exclusionary" programs. It is improper, however, to combine

19

PM's market share with RJR's market share in determining whether or not <u>PM</u> has market power. *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F. 2d 1413 (6th Cir. 1990)   Plaintiffs have alleged no facts in this case which would suggest, and have not established,  that PM and RJR have entered into any conspiracy such as would justify a combined share approach to determining market power.   In short, plaintiffs have produced no evidence to show that PM's market share translates into market power.

Plaintiffs also assert that there is direct evidence that PM has monopoly power "as shown by its ability to exclude rivals and control price."   In support of their assertion, plaintiffs point to certain affidavits and exhibits in which plaintiffs contend that PM's WL  program has undermined their competitiveness and increased their costs of distribution.  Plaintiffs also assert that PM's ability to control prices is "demonstrated by the pricing of its premium cigarettes at almost five times the level of 4th tier products,  its high product margins and inelastic demand for its products."  This Court has already found that PM's conduct with respect to its WL program of market share discounts is not illegal or anti-competitive but is rather a valid business reaction to market pressures.   Also, as pointed out by PM, the fact that PM prices its cigarettes at almost five times the level of 4th tier brands does not demonstrate PM's ability to unilaterally control the price.

While this Court has considerable sympathy with the plaintiffs in this case and the effects the WL program may have on their businesses, it is well established that "[c]ompetition is a ruthless process . . . and the anti-trust laws are not a balm for the rivals' wounds." *Tennessean Truck Stop, Inc. v. NTS, Inc.*, 875 F. 2d 86, 90 (6th Cir. 1989) (quoting *Ball Memorial Hospital, Inc. v. Mutual Hosp. Ins., Inc.*, 784 F. 2d 1325, 1338 (7th Cir. 1986))   It is also well established that the anti-trust laws are designed to protect competition, not individual competitors.   *Conwood*, 290 F. 3d at 788.  Simply put, there is no evidence, direct or indirect, in this record that PM has monopoly power.

### *Low barriers to entry*

The parties in this case apparently agree that entry into the U. S. cigarette market is relatively easy and that numerous new manufacturers and brands have entered the industry and successfully captured market share over the last few years.[4]   "The difficulty of entry into the market is relevant because if entry is easy, even a firm holding a commanding percentage of the market cannot charge a price above the competitive price,  for once it does, competitors will enter the market and undercut the firm's price." *American Counsel of Certified*

---

[4]      Since the Master Settlement Agreement of 1998, dozens of new cigarette manufacturers have entered the market and have captured approximately 15% of the market despite an overall significant decline in U.S. cigarette sales over the last 20 years.

*Podiatric Physicians and Surgeons* at 623. Plaintiffs respond to PM's argument that such actual entry "is a strong indicator" that PM lacks market power by arguing that such entry "has not constrained premium cigarette pricing" and asserts that "the fringe 4th tier manufacturers have been limited by punitive state legislation and restricted access to efficient distribution channels as spearheaded by PM and RJR." This Court fails to see how such arguments by the plaintiffs can overcome the undisputed evidence of ease of entry by competitors into the U. S. cigarette market, and both parties agree that the relevant market at issue in this case is the United States cigarette market, not just the market for premium cigarettes.

### *Excess capacity*

A firm also lacks market power when its competitors have excess capacity. Excess capacity is the ability of existing competitors to expand output to counteract a reduction in output by a provider with a large market share. Excess capacity inhibits monopoly pricing because consumers can obtain the product or service at competitive pricing from another provider Excess capacity deprives a relatively large "market share" of its normal "market power." *Rebel Oil Co.* at 1441. Two of PM's competitors, RJR and Lorillard, with a combined market share of less than 30%, together have the capacity to produce nearly 50% of the

400 billion cigarettes consumed in the United States in 2003. Plaintiffs respond to PM's argument by arguing that the excess capacity "resides primarily in PM and RJR" who have an "oligopoly strategy" of "supracompetitive" pricing. Plaintiffs ignore the fact that two of PM's competitors have nearly one-half of all excess capacity and that, as discussed by the Court above, market power is the ability of a single seller to raise prices and restrict output. Plaintiffs have presented no evidence that PM has the ability to control any other firm's production capacity or that PM can raise prices above competitive levels without rival manufacturers simply increasing output.

In summary, after examining barriers to entry, excess capacity, and PM's market share, plaintiffs have not established that there is a genuine issue of material fact as to whether or not PM has sufficient market power to establish a dangerous probability of success. *See Ford v. Stroupe*, 113 F. 3d 1234, 1997 WL 201560 (6th Cir. (Tenn.)) PM is, therefore, entitled to summary judgment for this reason alone.

### *ANTI-COMPETITIVE CONDUCT WITH THE SPECIFIC INTENT TO MONOPOLIZE*

As the Sixth Circuit has observed:

Anticompetitive conduct is conduct designed to destroy
competition, not just to eliminate a competitor. Lively
legal competition will result in the efficient and shrewd

businessman routing the inefficient and imprudent from the field. The anti-trust laws must be administered in such a way that they do not restrain such vigorous competition in order to protect inefficient competitors. As Judge Learned Hand has pointed out, "The successful competitor, having been urged to compete, must not be turned on when he wins" *United States v. Aluminum Co. of America*, 148 F. 2d 416, 430 (2nd Cir. 1945). Merely to attempt to succeed in business is not anti-competitive conduct.

*Richter Concrete Corp.* at 823.

Plaintiffs argue that PM's WL programs are exclusionary and anti-competitive and that specific intent to monopolize "can be inferred from the defendant's anti-competitive practices." Plaintiffs are correct that specific intent to monopolize may be inferred from evidence of anti-competitive conduct, see *Lorain Journal Co. v. United States*, 342 U. S. 143, 153 (1951), but not from legitimate business practices aimed only at succeeding in competition. *Times - Picayune Publishing Co. v. United States*, 345 U.S. 594, 626 (1952). Antitrust law protects competition, not particular competitors. *Spectrum Sports* at 458-459. Whether conduct is anti-competitive for purposes of Section 2 of the Sherman Act, 15 *U.S.C.* § 2, depends on "whether 'valid business reasons' can explain [defendants'] actions." *Eastman Kodak Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 483 (1992).

The inference claimed by plaintiffs here, however, is unavailable to them because they have been unable to establish that PM's WL program has anti-competitive effect. In fact, plaintiffs have been unable to establish that WL decreases rather than increases competition. At best, plaintiffs' proof establishes only harm to individual competitors, not harm to competition. Plaintiffs have failed to present evidence that creates a genuine issue of material fact to support their allegation that WL has foreclosed any cigarette manufacturer from access to the relevant market.

The relative lack of difficulty of entry into the U.S. cigarette industry likewise negates plaintiffs' claim of anti-competitive conduct. Were PM to charge a price above the competitive price for its products, this record establishes that either existing competitors (RJR and Lorillard) or new competitors would enter the market (or increase production) and undercut PM's price. As indicated above, RJR and Lorillard together possess about fifty percent (50%) of the excess capacity for production of cigarettes and dozens of new manufacturers have entered the market since 1998. PM's WL program is a valid business reaction to market pressure brought about by increased competition for a declining cigarette market. Moreover, these plaintiffs admit that, were they to choose to discontinue sales of fourth tier brands altogether in order to achieve PM's best discounts, those brands

would immediately be picked up by a competing distributor.

Thus, not only have plaintiffs not established a genuine issue of material fact on the issue of whether PM possesses sufficient market power to establish a dangerous probability of monopolization, no genuine issue of material fact exists on the issues of whether or not PM has engaged in anti-competitive conduct with the specific intent to monopolize. PM is likewise entitled to summary judgment on these grounds.

## Antitrust Injury

As set forth throughout this memorandum opinion, plaintiffs also cannot establish an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701(1977). Plaintiffs surely have suffered harm but such harm does not result from a decrease in competition rather than some other consequences of PM's WL program. Their injuries, therefore, are not injuries which the antitrust laws were intended to prevent.

An appropriate order shall issue.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE